DECISION
This matter is before the Court on a miscellaneous petition filed by the Rhode Island Department of Mental Health, Retardation and Hospitals ("MHRH"), and supported by the Rhode Island Department of Corrections, to transfer Pheakiny Nem from the Forensic Unit of the Eleanor Slater Hospital, where he has been receiving specialized mental health services as a psychiatric inpatient, back to the Adult Correctional Institutions ("ACI"), where he was incarcerated previously pending trial. Defendant Nem has entered a plea of nolo contendere to a charge of manslaughter in connection with his killing of his infant son (P/1-1998-2418) and his sentencing on that plea has been deferred, with his consent and that of the State, pending this Court's decision regarding this transfer petition. On behalf of Mr. Nem, the Mental Health Advocate has filed an objection to the transfer petition filed by MHRH.
This Court afforded Mr. Nem an evidentiary hearing with respect to this petition. At that hearing, the State supported the petition filed by MHRH, and Mr. Nem's criminal defense counsel opposed it. After considering the evidence presented at that hearing and the applicable law, this Court finds that MHRH failed to prove that defendant Nem has sufficiently recovered his mental health so as to warrant his return to the ACI. Mr. Nem is still mentally ill and in need of specialized mental health care provided to psychiatric inpatients at the Forensic Unit that cannot be provided at the ACI. Accordingly, for the reasons set forth in this decision, this Court will exercise its discretion and deny the petition.
 FACTUAL BACKGROUND AND PROCEDURAL HISTORY
There can be no dispute that Pheakiny Nem, age 34, is mentally ill and presents with a significant psychiatric history. His psychiatric history and his course of treatment (or lack thereof) is critical to this Court's analysis of whether he should continue to receive specialized mental health care as a psychiatric inpatient at the Forensic Unit or whether, instead, he should be returned to the ACI.
 The Early Years
Mr. Nem was born in 1967 in Cambodia and spent his early years in a war torn nation. He witnessed numerous gun fights at an early age. His family was forced to move often because they were refugees. When he was six or seven, he watched the Communists march into Phnom Penh and capture his father, a Captain in the army, at gunpoint. When it happened, he ran and hid. His father was later executed in the jungle and his two older brothers were forced to work for the Khmer Rouge. He was forced to work away from his family. Ever since these horrific events, he has felt extremely guilty for hiding instead of trying to help save his father.
In 1980, Mr. Nem moved to the United States with his mother and brothers in search of a better life. He graduated from high school and then had a series of short-term jobs in several companies doing primarily machine work. He was observed as paranoid in high school and difficult to communicate with because he distorted what others said. He talked about his guilt over his father's capture and had frequent nightmares. His difficulty in handling the past is exacerbated when he finds himself in a stressful situation.
 The Defendant's Course of Psychiatric Hospitalizations and Treatment Before Incarceration
In 1993, Mr. Nem had his first breakdown and was hospitalized for ten days at Butler Hospital. In the weeks leading up to this hospitalization, he had been agitated, hearing voices and delusional (believing that others were trying to hurt him or make fun of him) and showed a marked deterioration in his ability to function with basic life tasks. Upon admission, he was fearful, depressed, isolated and had a tortured look on his face. A family history of mental illness was noted, as his brother has a similar illness. It was determined that his illness was biochemical and not the result of life stress or environmental factors. He was diagnosed as having Major Depression, Recurrent, Severe, with Psychotic Features and Post-Traumatic Stress Disorder.
He then obtained outpatient treatment from the Providence Center which lasted from December 1993 until April 1998, after which time he stopped taking his medication. His outpatient treatment at the Providence Center consisted of a variety of anti-psychotic, antidepressant and mood stabilizing drugs. His compliance with his medications was irregular.
Mr. Nem had two periods of psychiatric hospitalization in July 1996 and January 1998 when he stopped taking his medications. While the medications helped him to clear his thoughts, improve his ability to concentrate and diminish his fear and paranoia, they also resulted in significant side effects such as nose bleeds, night sweats and blurred vision. He told a psychiatric social worker on May 11, 1998 that his new baby was causing much stress, that he felt his girlfriend deserved better and that he thought his infant son had a mental illness because the child frequently woke up screaming at the top of his lungs.
On May 25, 1998, the defendant killed his infant son. He reportedly had stopped taking his medication approximately four to five days before that date. He killed the child by grabbing him by the leg and swinging him like a baseball bat against the door. The details of this horrific event are contained in the witness statements and police narratives surrounding the State's criminal investigation. Three days later, the State charged the defendant with first degree murder in connection with the death of his infant son, and he was ordered held without bail at the ACI pending trial.
 Psychiatric Treatment at the ACI
Upon his pretrial incarceration at the ACI, the Department of Corrections placed Mr. Nem on a suicide watch in the crisis management unit (maximum) due to his psychiatric history, depression, and failure to contract for his own safety. On May 27, 1998, Dr. Martin Bauermeister, one of the prison's leading psychiatrists, found him to be tense, anxious and expressing thoughts of suicide. He found nonetheless that Mr. Nem answered rationally and responsively to his questions. When Dr. Bauermeister offered to continue Mr. Nem's past treatment, Nem refused saying that no medication had really made a difference. Dr. Bauermeister thus ordered him to remain in crisis management status. The next day the nursing staff found him staring at the ceiling and refusing to answer when others spoke to him.
On May 29, 1998, the defendant used his underwear to wash his bed. Alan B. Feinstein, who currently is the Supervising Clinical Psychologist and Director of Mental Health Services at the ACI, then conducted a clinical psychological examination of Mr. Nem. He found that Mr. Nem continued to refuse medication, wanted to die, and appeared withdrawn, depressed and uncommunicative. In contrast, Dr. Bauermeister noted that same day that Mr. Nem was more communicative and articulate, ambivalent about taking medication, and not actively suicidal. He released him from the crisis management unit and placed him in psychiatric observation.
On June 4, 1998, Mr. Feinstein released Mr. Nem from psychiatric observation at the request of Mr. Nem and his defense attorney. Mr. Nem denied any suicidal intentions, evidenced no psychosis and refused any offer of psychotropic medication. Mr. Feinstein found that there was no clinical evidence to support Mr. Nem remaining in psychiatric observation and that Nem would know how to contact mental health services if needed.
For the next four months that followed, Mr. Nem received no medication during his incarceration. On September 18, 1998, when Mr. Nem met with Dr. Michael Ingall, an expert psychiatrist retained by the defense in the criminal case, Nem was bewildered by the fact that he had been psychiatrically stable during that time period without medication. A week later, that situation changed.
On Friday, September 25, 1998, Mr. Nem experienced an acute psychotic episode and was readmitted to the crisis management unit (maximum) at the request of Mr. Feinstein who found him to be suicidal and psychotic. The guards had found Mr. Nem in a catatonic and rigid state, hearing voices, looking into the distance as if responding to voices, having to clean himself repeatedly and wringing his hands. He had not been on medication in the months prior to this episode. Three days later, Dr. Bauermeister, the prison psychiatrist, examined him and found him to be non-suicidal and unwilling to take medication due to side effects. He ordered Mr. Nem returned to the general population without medication.
On October 19, 1998, Mr. Nem was placed in crisis management status (maximum) after expressing thoughts of suicide following his return from court. He was not on medication at that time. Two days later, Dr. Greer, a prison psychiatrist, saw Mr. Nem at the request of Mr. Feinstein, the prison psychologist, who hoped that Dr. Greer could convince Nem to take his medication and also determine if it was appropriate to house Nem in the crisis management unit. Dr. Greer found Mr. Nem to be schizophrenic and psychotic and noted that he had been noncompliant with medication. Mr. Nem then requested "good thinking" medication and received those medications that he had received previously at the Providence Center for thought disorder, depression and mood stabilization (Anafranil, Depakote, Risperdal and Cogentin). Dr. Greer released him from crisis management status to the psychiatric observation unit. The next day, Dr. Greer found him to be psychotic with disorganized thoughts and hallucinations. He had been noncompliant with his medication but agreed to take his medication in the future. Nem refused some or all of his medication almost every day that he remained in psychiatric observation in October 1998. On October 29, 1998, Mr. Feinstein noted that he had continued to refuse his medication but that he denied being a danger to himself or others. He ordered Mr. Nem released from psychiatric observation back into the general population.
On November 6, 1998, Mr. Nem was readmitted to the psychiatric observation unit. He refused medication. The correctional officers had noticed prior to that time that he was not eating and remained in his cell, sleeping day and night, not speaking to anyone. He cried uncontrollably and expressed pain and sorrow about taking medication. Dr. Bauermeister explained to Mr. Nem on November 10, 1998 that he had schizophrenia. They settled on injections of an anti-psychotic drug that lasts for weeks (Prolixin) in lieu of the previously prescribed medications. Dr. Bauermeister released him back into the general population.
On November 16, 1999, Mr. Nem wanted to know why he was not taking his original medications. He said he could not sleep, and correctional officers observed him up all night pacing in his cell. He was returned to psychiatric observation and seen by Dr. Bauermeister who noted that he continued to complain about his medication. Mr. Nem was coherent without evidence of psychosis or a mood disorder. Mr. Nem wanted to show the doctor that he could be fine without medication, so Dr. Bauermeister agreed to discontinue his medications (Prolixin and Cogentin) and to discharge him back into the general population.
The next morning, Mr. Feinstein referred Mr. Nem for medical attention for a possible reaction to Prolixin. Later in the hospital area, Mr. Nem started to talk about his medication and a shot given to him by Dr. Bauermeister. He became very upset and was placed on psychiatric observation in segregation.
On November 19, 1998, Mr. Nem was found banging the door of his cell and saying he had the right to kill himself. He was placed, once again, in crisis management status. A request was made that he be seen by a psychiatrist as soon as possible. Dr. Bauermeister saw him the next day, and Mr. Nem asked to be put back on his old medications from the Providence Center. According to Dr. Bauermeister, Mr. Nem recognized that he had asked to be taken off the medication and now realized he needed treatment. Dr. Bauermeister prescribed those medications and released Mr. Nem back into the general population. Later that day, he was returned to the crisis management unit because he had threatened to kill himself if he did not get his medication. Dr. Bauermeister was paged, and Mr. Nem ultimately took his medication. On November 23, 1998, Mr. Nem was released back into the general population. In the months that followed, Mr. Nem requested numerous changes in his medication. Dr. Bauermeister complied with all of his requests.
In March 1999, Dr. Robert Cserr, an expert psychiatrist retained by the State in the criminal case, interviewed Mr. Nem at the ACI. He diagnosed Nem as having Schizoaffective Disorder, Depressive Type.
In June 1999, this Court ordered an evaluation of defendant Nem to determine whether he was competent to stand trial. Dr. Feola, a forensic psychiatrist at MHRH, evaluated Mr. Nem and determined that he was competent to stand trial. That determination was not contested by the defense. The trial was scheduled for October 1999.
In July 1999, Mr. Nem was seen again by Mr. Feinstein at the request of a correctional officer who found him crying and hallucinating. Mr. Feinstein admitted Mr. Nem to the psychiatric observation unit, but later in the day, Dr. Bauermeister ordered Mr. Nem returned to the general population after Nem indicated that he did not want to resume his medication.
Sometime between the end of July and the end of August 1999, Mr. Nem's psychiatric condition began to deteriorate once again. He began to isolate himself from others, appeared anxious and tearful, refused food and could not sleep. Guards observed Mr. Nem to be extremely agitated, crying and tearing at the flesh of his chest with his fingernails until he had deep scratches and was bleeding. On August 31, 1999, Mr. Feinstein ordered Mr. Nem to be transferred to the psychiatric observation unit after he determined Nem to be confused, hallucinating, and tearful but not suicidal. Dr. Bauermeister saw him that same day. He said that Mr. Nem was confused, stuttering, stammering and giving a somewhat incoherent account of the problem that brought him to the attention of the correctional staff. He wrote, "this has happened before. He went off his medication." Dr. Bauermeister indicated that Mr. Nem did not want to take his medication but that he would start him on medication anyway. He noted that if Mr. Nem continued to refuse his medication, he would try to have him transferred to the Forensic Unit. He prescribed Risperdal, Cogentin and Depakote.
On September 2, 1999, Dr. Bauermeister recorded that Mr. Nem refused to take his medication but that he did come around to the recognition that he needed treatment. The ACI records indicate that Mr. Nem was seen by his criminal defense attorney and Dr. Ingall, defense expert in his criminal case, on that date. On September 3, 1999, Mr. Feinstein wrote that Mr. Nem had been seen daily since August 31, 1999 with no improvement and that he was confused, disoriented, crying and hiding in his cell in a fetal position with possible auditory hallucinations. The records note that these observations were shared with the Attorney General's Office and Mr. Nem's attorney. Mr. Feinstein noted that the plan was for Mr. Nem to remain in psychiatric observation until Dr. Bauermeister determined whether to recommend that he be transferred to the Forensic Unit.
Dr. Ingall testified that when he visited Mr. Nem, he found Nem curled up naked in a fetal position and experiencing an acute episode of psychosis. Dr. Ingall noted that Mr. Nem was anxious and tearful, had been tearing at his flesh (as evidenced by scratches across his chest), was sweating and wild eyed, had been hearing voices and had disorganized thoughts. According to Dr. Ingall, the guards and nurses present were extremely dismayed by his condition and felt that Mr. Nem belonged in a hospital.
Dr. Ingall wrote a letter to Mr. Nem's criminal defense counsel on September 5, 1999 in which he condemned the psychiatric treatment that Nem had received during his incarceration at the ACI. He criticized the ACI policy of zealously guarding and endorsing the "right" of patients to refuse medication. He argued strenuously that it was medically inappropriate to allow a psychotic patient such as Mr. Nem to refuse to take medication that could help him when it was his mental health condition itself that deprived him of the judgment needed to accurately determine his need for the medication. Dr. Ingall advocated an immediate transfer of Mr. Nem to the Forensic Unit of the Eleanor Slater Hospital and suggested that, with the right medication, his condition and his judgment would improve.
 The Petition for an Emergency Transfer of the Defendant to the Forensic Unit Filed by the Department of Corrections
On September 9, 1999, after the receipt of Dr. Ingall's letter written on behalf of Mr. Nem, the Director of the Department of Corrections filed a verified emergency petition to transfer defendant Nem from the ACI, where he was being held without bail pending trial, to the Forensic Unit of the Eleanor Slater Hospital. The petition stated that defendant Nem was mentally ill and required specialized mental health care and psychiatric inpatient services that could not be provided in a correctional facility. It stated further that the defendant's mental illness was of such a nature as to create the need for immediate transfer to the Forensic Unit for emergency treatment and examination. An affidavit and a letter dated September 6, 1999 from Dr. Martin Bauermeister to Jeff Laurie, the Deputy Director of Rehabilitative Services for the Department of Corrections, accompanied the petition.
In his affidavit, Dr. Bauermeister opined that Mr. Nem was suffering from a recurrence of psychotic depression. He stated that Mr. Nem not only refuses treatment but is "not capable to make treatment decisions." He thought that Mr. Nem would benefit from transfer to the Forensic Unit for treatment of his mental illness (in essence conceding that, at that time, Mr. Nem could not be treated adequately at the ACI).
In his letter, Dr. Bauermeister chronicled the defendant's historic ambivalence about taking medication during his incarceration. Mr. Nem, according to Dr. Bauermeister, went through several cycles where he was prescribed medication, complained about taking the medication or requested a change in medication, went off the medication (at his request), experienced a recurrence of psychiatric symptoms, was prescribed medication again and then refused again to take the medication. Dr. Bauermeister noted that in March 1999, he discontinued all medications for Mr. Nem, at Nem's request, as he considered Mr. Nem competent to make his own treatment decisions. According to Dr. Bauermeister, "without medication, Mr. Nem did surprisingly well." Yet Dr. Bauermeister acknowledged that Mr. Nem had to be returned to psychiatric observation in July 1999 and again in September 1999 and continued to refuse medication.
Dr. Bauermeister indicated that as of September 6, 1999, Mr. Nem was depressed, distressed, incoherent and sleeping most of the day curled up on his cot in his cell. He would stammer and whisper in response to the doctor's attempts to get him to take his medication. Dr. Bauermeister believed that although not a danger to himself or others, Mr. Nem could not function in the prison environment without treatment. He opined (contrary to his stated position six months earlier) that Mr. Nem was not competent to make his own treatment decisions.
Neither the defendant, the Mental Health Advocate, MHRH nor the State objected to the petition filed by the Department of Corrections for the emergency transfer of Mr. Nem to the Forensic Unit. This Court granted the petition based on the sworn statements contained therein, as supported by the affidavit and letter of Dr. Bauermeister, and the absence of any objection to the emergency transfer on the part of MHRH or the defense. This Court thus ordered Mr. Nem to be transferred immediately from the ACI to the Forensic Unit so he could receive specialized mental health services and psychiatric inpatient services that the ACI could not provide.
 Psychiatric Treatment at the Forensic Unit
On September 8, 1999, the Forensic Unit admitted Mr. Nem for psychiatric treatment. Mr. Nem was diagnosed with psychosis, not otherwise specified, with major depressive features as well as post-traumatic stress disorder. Dr. Surti testified that when he met Mr. Nem upon his admission to the Forensic Unit in September 1999, Mr. Nem was scared and nervous, had great difficulty communicating, displayed a disorganized thought process, admitted to hearing voices and having hallucinations, showed signs of depression and had a sad affect without emotion.
Within a few days, the staff in the Adult Psychiatric Services Unit developed a Master Treatment Plan for Mr. Nem (the "Plan"). The Plan identified four specific problems evidenced by Mr. Nem that necessitated his receipt of specialized mental health services and psychiatric inpatient care and further identified the short-term and long-term goals to address each of those problems, the specific treatment interventions and disciplines that should be employed to address each of the problems and the criteria for terminating treatment for each such problem. It also identified the specific criteria to be met before such inpatient treatment could be terminated.
The Plan identified Problem #1 as his need for psychiatric stabilization after transfer from the ACI. It suggested that the immediate objective would be to get Mr. Nem to accept medication daily with a longer-term objective of stabilization and return to the ACI. It recommended involving Dr. Bauermeister and ACI staff in periodic reviews of the patient as to his level of recompensation. Treatment would not be terminated unless the ACI agreed that Mr. Nem was stabilized for transfer.
The Plan identified Problem #2 as Mr. Nem's condition of acute psychosis with major depressive symptoms. It noted that upon admission, Mr. Nem displayed disorganized thoughts, an inability to answer questions directly and paranoia regarding his medication and others. He showed anxiety, preoccupation, feelings of worthlessness and hopelessness and extreme guilt and shame for the murder of his child. The Plan sought, in the near term, to eliminate the severity of these symptoms and to get Mr. Nem to accept medication daily. The longer term objectives included the significant reduction of these symptoms so that he could function at an optimal level and determination of his underlying depression. It recommended daily treatment with Olanzapine (Zyprexa), an anti-psychotic medication, and Benadryl, for side effects and anxiety, as prescribed and monitored by a psychiatrist. It further recommended daily monitoring by the nursing staff for signs and symptoms of psychosis or depression or any side effects. Mental health workers would work on his involvement in daily activities on the ward with appropriate praise afforded him. Social workers would encourage family support and meet with him every two weeks to monitor treatment compliance and substance abuse group attendance. The psychologists would assess weekly his psychiatric symptomology and depressive symptoms and obtain information regarding his psychiatric history from the Providence Center and Butler Hospital. Expressive therapists would use techniques to counter his depression and encourage involvement in group activities. Treatment would not be terminated unless Mr. Nem achieved recompensation of his psychotic symptoms and displayed organized and goal-directed thoughts, an absence of paranoia and a more stabilized mood.
The Plan identified Problem #3 as a history of immediate proximity trauma based on Mr. Nem's exposure to war atrocities and the killing of his father by the military in Cambodia during his childhood. It noted that post-traumatic stress disorder was a strong factor in his illness and that he continued to experience flashbacks. The Plan recommended that Mr. Nem participate in weekly individual counseling and daily ward activities in the short-term and eventually be able to work through his difficulties related to his post-traumatic experiences through a support network of psychologists, social service providers and expressive therapists. It further advised prescription of anti-psychotic and mood stabilizing medications to treat this problem. Treatment for this problem would not be terminated until Mr. Nem showed improvement in his symptoms.
The Plan identified Problem #4 as his history of noncompliance with treatment. It noted that, in the past, Mr. Nem had refused an increased dosing of Olanzapine (Zyprexa), was reluctant to take the medication prescribed for him at the Providence Center, and also had refused to take Prolixin due to its side effects and his belief at one point in time that the medication was responsible for his killing his child. To address this problem, the Plan set the short-term goals of Mr. Nem accepting medication daily and being able to demonstrate an understanding of his need for treatment (by being able to describe the benefits of taking the medication and the drawbacks of not taking the medication). It set a longer-term goal for Mr. Nem of establishing a long-term trusting relationship with a psychiatrist so that he could maintain a stabilized state with minimal side effects. The Plan recommended that medication be prescribed to Mr. Nem to minimize its side effects, that he be involved in regular discussions with his psychiatrist regarding his medication, that he receive medication education weekly and praise from the nursing staff, and that he receive psychological and social services to reinforce his compliance and increase his insight into his mental illness. Treatment for this problem would not be terminated until Mr. Nem accepted medication for two weeks without prompting and agreed to accept medication and treatment at the ACI.
In summary, the Plan provided for the following interventions to address Mr. Nem's psychiatric problems: medication through psychiatric care, individual meetings and activities, group activities, expressive therapy, behavior therapy, meetings with family and individual psychotherapy. It noted that for Mr. Nem to be discharged from the Forensic Unit, he would have to be psychiatrically stabilized, with goal-directed thinking and the absence of hallucinations. It further identified his strengths connected with these discharge criteria (i.e., his pleasant and cooperative manner, the existence of family, some insight on his part, his work history and his affiliation with the Court), his weaknesses (i.e., his past assaultive behavior, difficulty communicating, limited education, lack of family involvement, serious legal charge, history of extreme trauma and poor impulse control) and the items that would act as positive reinforcers (i.e., snacks, music, verbal praise, smoking and one-on-one attention). The mental health providers at the Forensic Unit anticipated that he would be administered daily medication and also be seen regularly by mental health staff members. Indeed, the records from the Forensic Unit reflect that Mr. Nem was seen almost every day and on many days was seen by multiple members of the mental health staff for most of 1999 and 2000. In late 2000 and on into the spring of 2001, the visits became less and less frequent, but still averaged weekly or more. Mr. Nem was seen at least monthly by his supervising psychiatrist and often more frequently as side effects of medication were addressed.
Defendant Nem initially received specialized mental health services at the Forensic Unit for about six weeks. He was started on Olanzapine (Zyprexa), an anti-psychotic medication, with Cogentin also prescribed for side effects. When he refused an increased dosage of the anti-psychotic medicine five days later due to side effects of restlessness and sleepiness, Quetipine, another anti-psychotic medicine, was substituted for the Olanzapine (Zyprexa). About two weeks thereafter, a third anti-psychotic drug, called Molindone, was prescribed instead of Quetipine.
In early November, 1999, however, Mr. Nem displayed increased anxiety and suicidal thoughts. He claimed that the Molindone caused him restlessness, and he asked to receive the Olanzapine (Zyprexa) once again. Benadryl was prescribed with the Olanzapine (Zyprexa) to counteract the restlessness and anxiety. He had a good response to these medications (less anxiety and fewer suicidal thoughts) and has remained on these medications to this day.
While residing at the Forensic Unit, Mr. Nem has received medical treatment, substance abuse treatment, social work services, weekly supportive education and therapy regarding his illness and medication from psychologists, and daily individual counseling regarding his medications. The Forensic Unit staff periodically reviewed Mr. Nem's progress in meeting the goals set under his Plan. This review process included monthly progress reports of Dr. Wagner, Chief Clinical Psychiatrist at the Forensic Unit. It also included quarterly treatment plan review reports reflecting input from all staff treating Mr. Nem in the Forensic Unit, including Dr. Wagner (Mr. Nem's treating psychiatrist), a psychologist, a mental health worker, a nurse, a social worker, an activity therapist, a physician and a dietitian.
At the first review on November 22, 1999, it was noted that Mr. Nem was stabilized and no longer required hospital-level care, that he believed Olanzapine (Zyprexa) (the anti-psychotic medication that he had been prescribed) produced fewer side effects and stabilized his psychotic symptoms, and that a supportive structure and milieu had been helpful in addressing his symptoms of post-traumatic stress disorder. As to his problem of noncompliance with treatment, however, the reviewing staff noted that he still continued to argue that his dosage of medication needed to change but in the context of verifiable side effects and that in spite of mild akathesia, Mr. Nem continued to accept his medication.
At the review on January 24, 2000, the staff noted that Mr. Nem's symptoms were remitted with medication and that he was compliant with his medication. It was further noted that Mr. Nem continued to receive regular counseling about the need and importance of taking his medication and possible side effects and that he seemed to manifest some understanding of those matters. He remained anxious and fearful about his possible return to the ACI. It was noted further that Mr. Nem's symptoms of post-traumatic stress disorder become evident with stress.
At the reviews in February, March, April, May, and June 2000, the staff generally observed that Mr. Nem continued to be stabilized, that his psychotic symptoms were in remission and stabilized with medication and monitoring and that this treatment also ameliorated any problem with post-traumatic stress. He manifested mild akathisia as a side effect. He was fully compliant with treatment but remained fearful of a return to the ACI. It was noted that he had some understanding of his illness and need for treatment (i.e., the name, dosage and indication for his medications) but that he needed teaching to realize the ongoing needs for his medication. Over this time period, he began to withdraw from participation in group substance abuse therapy sessions and attended expressive group therapy less willingly.
On the July 31, 2000 review date, a similar report was made. The staff noted that Mr. Nem continued to be stable and that the medication ameliorated any complaints or symptoms of depression. While noting no present evidence of post-traumatic stress, the staff expected to see a dramatic increase in anxiety should Mr. Nem get close to a return to the ACI. It noted that under increased stress, his symptoms of post-traumatic stress disorder could recur. With regard to medication compliance, the staff noted that he was "fully compliant with treatment at this time in a structured setting" but that "compliance in an unstructured setting is questionable."
A similar report was made in August 2000. By early September 2000, the staff noted that Mr. Nem was becoming increasingly isolative. He did not attend his expressive therapy group session, as he had the month before, and the activity therapist noted a lack of involvement due to his diminished financial resources. He continued to resist involvement in substance abuse therapy sessions. Mr. Nem denied depressive symptoms but said he was not feeling well.
On September 18, 2000, the staff conducted a more detailed annual psychological assessment of Mr. Nem. It noted that Mr. Nem had moderate insight into his mental illness, that he had a history of noncompliance with medication treatment secondary to side effects such as difficulty concentrating, stomach upset and significant akathisia, and that he was compliant with treatment without a petition for instructions. For the first time, the record noted that Mr. Nem had agreed that he would continue to accept medication either at the Forensic Unit or the ACI. It further noted that he had been psychiatrically stable for the past year with medication and no longer reported depressed mood, paranoid delusional ideas, disorganized thinking, auditory hallucinations, or suicidal ideation, intent or plan. It noted that his history of post-traumatic stress (based on his exposure to war atrocities in Cambodia as a child) continued to be a strong factor in his illness, that he continued to have flashbacks of the incidents that increased with stress and that his substance abuse and avoidance behavior also might be associated with that disorder. The staff observed that Mr. Nem was not a management problem, with the exception of occasional inappropriate touching and reluctance to participate in ward activities. It made note of his risk factors: history of assault, acting on his delusions, noncompliance with medication, post-traumatic stress response and alcohol abuse. His environmental stressors were listed as: serious legal charges, incarceration, strained family relations, minimal support and cultural barriers. It noted that he remained isolated, related to few individuals on the unit, often preferred to stay in his room and had superficial relationships with others. The staff noted that he was likely to become noncompliant with his medication in an unstructured setting.
The Annual Psychological Assessment included the following recommendations: involvement in a Cambodian support network through the Providence Center, substance abuse education, cognitive therapy and development of coping skills, and vocational training. His Plan of Care provided for biweekly meetings to assess his level of psychiatric symptomology (depression, anxiety and guilt), weekly education to enhance his ability to cope with anxiety, encouragement and praise for his cooperation on the ward, weekly insight therapy and substance abuse counseling.
The staff reports in October and November 2000 continued to mirror those reports made earlier in the fall. By November 2000, it was noted that Mr. Nem often stayed in bed for most of the day. His participation in expressive therapy was encouraged but it was noted that he would need to be pushed out of bed to participate. Significant depression was mentioned.
On December 18, 2000, the staff reviewed Mr. Nem's case again in the ordinary course. That review, too, noted his continued psychiatric stabilization, absence of symptoms of psychosis and lack of symptoms of post-traumatic stress (although Mr. Nem reported distressful thoughts about past events and it was noted that his mother was ill and he was encouraged to write her). He was deemed compliant with treatment, and it was noted that he enjoyed his work in the laundry room. This report noted no evidence of depressive symptoms.
Beginning with his report in January 2001, Dr. Wagner made mention of Mr. Nem's statements that he would continue treatment at the Forensic Unit or the ACI and that, although he continued to fear a return to the ACI, he would continue treatment there. He also noted for the first time that Mr. Nem had been advised of the risks, benefits and alternatives to treatment. The staff also began to note, contrary to some previous references, that Mr. Nem showed no side effects of the medication and reported none, that he readily accepted the medication and participated in education and counseling sessions, and that he demonstrated an understanding of his medication. It was noted that compliance was encouraged through praise and positive feedback. In February 2001, Dr. Wagner first made mention that despite an increased census on the Forensic Unit, Mr. Nem had not changed symptomatically. He reiterated his January comments. In February, he rendered a similar report.
On March 29, 2001, the staff made a similar report after its review. Mr. Nem remained stable and denied symptoms of psychosis or depression. With regard to his history of post-traumatic stress, it was noted that he has flashbacks of past events and distressful thoughts and nightmares. His mother's illness was noted again. The staff repeated its earlier note that he was compliant with treatment in a structured environment but that it was unlikely that he would be compliant without structure. In April 2001, Dr. Wagner issued a report similar to those he wrote in the past, except that he specifically noted that "recurrent PTSD syndrome is possible in the future."
In early May 2001, Mr. Nem learned that Dr. Wagner would be leaving the Forensic Unit. The staff noted that the prospect of Dr. Wagner leaving caused Mr. Nem to evidence increased anxiety. The treatment team also noted Mr. Nem's failure to follow ward rules. Mr. Nem began reporting occasional mild depression. It was noted that additional psychological services would be provided. Later in the month and on into June, after Mr. Nem entered a plea to his criminal charges, he evidenced an improved mood. In early June, the staff noted that he would continue to meet with a psychologist biweekly to assess the presence of depressive symptoms to allow him an opportunity to express his feelings and to offer him support and praise for his participation in ward activities and compliance with his medication and treatment.
On June 27, 2001, the staff noted that he continued to be stabilized with medication treatment and monitoring, that he denied symptoms of psychosis or depression but that he remained withdrawn and inactive (often sleeping during the day due to what he described as "boredom"). It was noted that he continued to have flashbacks and nightmares, that he refused to attend substance abuse treatment because it initiated a post-traumatic stress response and that his anxiety and guilt had lessened with an improvement in his mother's health and resolution of his legal situation. It was noted that he had some insight into his illness and need for medication, but that he would need continued monitoring for medication effectiveness, side effects and compliance. The same concerns expressed previously by the staff about his treatment compliance in a structured versus an unstructured environment were raised again.
 The Petition to Return the Defendant to the ACI
On October 21, 1999, approximately six weeks after his original transfer to the Forensic Unit, MHRH filed a petition to return defendant Nem to the ACI, arguing that Nem had been evaluated by a psychiatrist at the Forensic Unit and no longer needed specialized psychiatric treatment and inpatient care at the Forensic Unit. It supported that petition with a report by Dr. Wagner, the defendant's treating psychiatrist at the Forensic Unit. In that report, Dr. Wagner noted that as of October 19, 1999, Mr. Nem had been fully compliant with Molindone and although anxious, had decreased agitation and paranoia. He recommended that because Mr. Nem was no longer overtly psychotic, he no longer needed specialized psychiatric treatment. He further noted, however, that continued treatment, with medication, would be necessary to maintain his current level of response and functionality. Ironically, it was not until a few weeks after MHRH filed this transfer petition that MHRH finally settled on the medication regimen that seemed to work for Mr. Nem and on which he still remains today.
The following day, the Mental Health Advocate filed an objection to the petition, at defendant's request, by which he argued that Mr. Nem should remain at the Forensic Unit. That objection was supported by an affidavit of the Mental Health Advocate, Reed Cosper, and the report of Dr. Michael Ingall following his visit with Mr. Nem in early September 1999. The Mental Health Advocate requested an evidentiary hearing with regard to the transfer petition filed by MHRH, and MHRH opposed that request.
With the agreement of the parties, this Court consolidated the transfer petition filed by MHRH as to defendant Nem with two other similar petitions filed by MHRH in connection with two other inmates. See In Re: Kevin Clark, M.P. 99-1601, consolidated with In Re: Rahsaan Muhammed, M.P. 99-1602 and In re: Pheakiny Nem, M.P. 99-4546 (R.I. Super. Ct.) (June 21, 2000) (Savage, J.). The purpose of that order of consolidation was to allow the Court to address legal issues common to all three petitions, namely whether those defendants were entitled to evidentiary hearings with respect to the transfer petitions filed by MHRH and, if so, which party bears the burden of proof at such a hearing and what is the quantum of evidence required to sustain that burden. The parties agreed that Mr. Nem would remain at the Forensic Unit until this Court rendered its decision on the legal issues in the consolidated cases.
After the receipt and review of extensive legal memoranda filed by MHRH and the defendants in those consolidated cases, this Court issued a written decision on June 21, 2000 with respect to the legal issues presented by the transfer petitions. This Court held that section 9 of the Mental Health Law, R.I. Gen. Laws § 40.1-5.3-9, provides an inmate with a right to a hearing on any petition filed by the Director of MHRH to transfer a defendant from the Forensic Unit back to the ACI. Id. The instant petition of MHRH is illustrative of why such a hearing is critical. This Court held further that in connection with such a petition filed by MHRH, the Director must prove, by a preponderance of evidence, that the inmate has sufficiently recovered his or her mental health (in that there is no longer clear and convincing evidence that the inmate is mentally ill and needs specialized mental health services and psychiatric inpatient services that cannot be provided in a correctional facility) and that the Court should exercise its discretion to order the return transfer. Id.; see §§ 40.1-5.3-7 and 40.1-5.3-9.
After issuance of this Court's decision on the legal issues raised by the consolidated petitions, defendant Nem, the Mental Health Advocate and MHRH further agreed that the transfer petition involving defendant Nem could be held in abeyance pending the trial or disposition of his underlying criminal case. On March 19, 2001, defendant Nem entered into an open-ended plea agreement with regard to the criminal case by which he pled nolo contendere to a reduced charge of manslaughter with a maximum sentence, as set by law, of 30 years to serve. No promises were made to the defendant as to the length of sentence that ultimately would be imposed or as to the location of any confinement. MHRH later sought to schedule the evidentiary hearing on its request to transfer Mr. Nem back to the ACI.
On July 9 and 10, 2001, this Court convened an evidentiary hearing on the transfer petition filed by MHRH. At that hearing, the Department of Corrections joined in the request of MHRH to transfer Mr. Nem back to the ACI. The Mental Health Advocate opposed the petition on behalf of Mr. Nem. The Attorney General's Office, representing the State in the underlying criminal case, appeared in support of the petition, and Mr. Nem's criminal defense counsel appeared in opposition to it. All of these interested parties agreed that this Court should defer sentencing the defendant in the criminal case until after decision with respect to the transfer petition and that any evidence presented during the hearing on the transfer petition could be considered by the Court in sentencing the defendant.
 The Evidence at the Hearing on the Petition by MHRH to Transfer Mr. Nem from the Forensic Unit Back to the ACI
At the hearing on the petition filed by MHRH to transfer Mr. Nem back to the ACI, the parties agreed that the Court could accept as full exhibits all of the expert reports, medical records and criminal records concerning Mr. Nem that had been previously submitted to the Court in connection with the underlying criminal case. Updated medical records also were submitted as exhibits. The expert reports included multiple reports from Dr. Ingall (the defense expert in the criminal case), a report from Dr.Cserr (the State's expert in the criminal case) and a report from Dr. Gutheil (an independent psychiatric expert appointed by this Court in the criminal case) — all of which referenced Mr. Nem's psychiatric history and detailed those experts' opinions about the nature of his mental illness and his state of mind at the time of the crime. The voluminous medical records included Mr. Nem's psychiatric records from Butler Hospital, the Providence Center, St. Joseph's Hospital, the ACI and the Forensic Unit of the Eleanor Slater Hospital that have been referenced by this Court.
In support of its transfer petition, MHRH presented the testimony of Dr. Brandon Krupp, Chief of Psychiatric Services at the Eleanor Slater Hospital. The thrust of his testimony centered on the appropriate role of the Forensic Unit in the treatment of inmates from the ACI who have mental illnesses.
Dr. Krupp testified that the essential role of the Forensic Unit is to provide inpatient hospital-level psychiatric care to inmates in need of such treatment where it is clear that such treatment only can be provided in a hospital setting. He indicated that the transfer of an inmate from the ACI to the Forensic Unit would be appropriate if the inmate had a severe mental illness and was in need of specialized mental health care services that could not be provided at the ACI. According to Dr. Krupp, that could include situations where the psychiatric care provided at the ACI had failed or was inadequate, where the incarcerated individual had refused treatment at the ACI to the detriment of his or her mental health, where the incarcerated individual was at severe risk of causing violence to himself or herself or others or if the inmate had experienced profound decompensation in prison. He identified the following as services that could be afforded an inmate at the Forensic Unit that would not be available at the ACI: round the clock nursing care, administration of medication and monitoring for side effects, treatment for conditions that might be exacerbating the inmate's psychiatric problems, management of violent tendencies and more frequent assessment, interaction and follow-up in the provision of mental health services.
Dr. Krupp acknowledged that the decision to petition for transfer of an inmate from the prison to the Forensic Unit would be made by the Department of Corrections. Even though MHRH has the statutory right to petition for such transfer, he was not aware that MHRH had ever done so.
Dr. Krupp made reference to an MHRH policy regarding the admission of inmates to the Forensic Unit. That policy (which did not go into effect until August 1, 2000 — after the Department of Corrections petitioned the Court for the transfer of Mr. Nem to the Forensic Unit and after MHRH petitioned for his return transfer to the ACI) provides for the admission to the Forensic Unit of "persons ordered transferred by the Court for hospital level psychiatric treatment after application by the Department of Corrections." (Ex. 8). The language of this policy differs significantly from the language of the Mental Health Law. See R.I. Gen. Laws § 40.1-5.3-7(b). It also provides for the admission to the Forensic Unit of persons deemed incompetent to stand trial and persons found not guilty by reason of insanity.
Dr. Krupp also testified about the criteria MHRH employs before recommending that an inmate be transferred back to the ACI from the Forensic Unit. He acknowledged that these petitions are filed by MHRH rather than the Department of Corrections. MHRH would petition for a return transfer of the inmate to the prison from the Forensic Unit if the person had benefited from treatment and met the goals established for the person at the beginning of treatment at the Forensic Unit. He acknowledged that, upon discharge, an inmate could relapse after his or her return to prison and might require repeated rehospitalization and the receipt of an increasing level of services from the Forensic Unit over time.
As to Mr. Nem, Dr. Krupp testified that he had never examined him but did believe, based on a review of records, that the defendant is mentally ill. He thought Mr. Nem's transfer to the Forensic Unit in September 1999 was warranted as he had received inadequate treatment, refused treatment, was violent and had experienced severe psychotic symptoms, including profound decompensation. Dr. Krupp testified that he would not be recommending that Mr. Nem be returned to the prison if he did not believe that the ACI could treat him properly. He acknowledged, however, that he had only general knowledge about the psychiatric services offered at the ACI and had no idea how many inmates were incarcerated there with chronic mental illness. He had engaged in recent conversations with ACI personnel to ensure that mental health personnel at the prison would work to carry out any instructions from the Forensic Unit regarding the psychiatric treatment of a given inmate.
Dr. Krupp made reference to a recent policy dated August 1, 2001 that MHRH had adopted at his direction after the filing but before the hearing on the instant petition by MHRH to return Mr. Nem to the ACI. The policy governs the documentation required upon discharge of individuals from the Forensic Unit and their return transfer to the ACI. It provides for the preparation of a Forensic Treatment Discharge Summary Report to be completed by the patient's treating psychiatrist prior to the inmate's return to the ACI. (Ex. 9). The policy states that such document will detail the care and treatment the inmate received on the Forensic Unit and serve as the required Eleanor Slater Hospital Discharge Summary. Under this policy, Dr. Krupp, in his capacity as the Chief of Psychiatric Services at the Eleanor Slater Hospital, or his designee, would be required to review the Forensic Treatment Discharge Summary Report prior to its submission.
Dr. Krupp indicated that the Forensic Unit has the capacity to treat approximately 20 patients. Of that number, two patients are housed there pursuant to determinations that they were not guilty by reason of insanity and one or two other patients are housed there due to incompetency. He noted that the Forensic Unit has certain statutory obligations as to these patients that require their continued hospitalization beyond what they need from a clinical standpoint. MHRH's preference, whenever possible, is to move Forensic Unit patients onto the civil ward and then out into the community for outpatient treatment when they no longer need hospital-level care.
MHRH also presented the testimony of Dr. Ghulam Surti, a treating psychiatrist on the Forensic Unit, in support of its petition to return Mr. Nem to the ACI. Dr. Surti did not become involved in Mr. Nem's care until June of 2001 (shortly before the transfer hearing). From September 1999 through May 2001, Mr. Nem had been treated in the Forensic Unit by Dr. Wagner who left the Forensic Unit in May 2001 and did not testify at the hearing. Dr. Surti reviewed Mr. Nem's medical records in preparation for his testimony.
Dr. Surti diagnosed Mr. Nem as suffering from schizophrenia, paranoid type, and post traumatic stress disorder. His diagnosis differed from that of Dr. Wagner who opined that Mr. Nem suffers from a psychotic disorder, not otherwise specified, and post traumatic stress disorder.
Dr. Surti testified at the hearing that the biggest problem with patients like Mr. Nem is treatment compliance. The Forensic Unit addresses that problem through extensive education and therapy. According to Dr. Surti, Mr. Nem has not refused to take his medication over the last two months. It was his opinion that Mr. Nem now understands the effects of the medications and his need for them such that he can give informed consent to treatment. He believes that the medicine has helped with Mr. Nem's psychotic symptoms and that in the past two months, Mr. Nem has shown no signs of hearing voices, hallucinating, being delusional, or having problems with his thought process. He also is less anxious. Dr. Surti believes that, with treatment, Mr. Nem's post traumatic stress disorder is in remission and that he has no active symptoms of depression or psychosis. Similarly, he believes that his current diagnosis is one of schizophrenia (paranoid type) that also is in remission with no active symptoms as long as he is receiving treatment.
In Dr. Surti's opinion, for Mr. Nem to remain psychiatrically stable, he needs to be regularly compliant with his medications, have ongoing counseling about the medications and their side effects and be monitored closely as to reported side effects. Dr. Surti is of the opinion that Mr. Nem no longer requires inpatient hospital level care, that he has no active symptoms or side effects and is not a danger to himself or others. Dr. Surti opined that Mr. Nem could be safely transferred to the ACI, as long as someone dispenses the medication to him and monitors him for side effects. He expressed his understanding that the ACI could give Mr. Nem his medication, monitor him while on the medication and counsel him regarding compliance.
It was Dr. Surti's opinion, expressed at the hearing, that the risk that Mr. Nem will not be compliant with his medication is very real and that he needs to be seen daily to make sure that he takes his medication and is monitored for side effects. Dr. Surti indicated that Mr. Nem was accurate in reporting side effects and that he would not refuse to take medication but that he would complain about the side effects. He acknowledged that the ACI does not involuntarily administer medication but instead transfers the patient to the Forensic Unit if noncompliance with medication becomes a problem. Dr. Surti also acknowledged that if Mr. Nem is not compliant with his medication, there is a greater chance that he will suffer a psychotic relapse.
On behalf of Mr. Nem, the Mental Health Advocate presented the testimony of Dr. Michael Ingall who had met with Mr. Nem on several occasions in the past and reviewed Mr. Nem's medical records to determine whether, in his professional opinion, Mr. Nem should be transferred back to the ACI. Dr. Ingall opined that Mr. Nem is in need of long-term psychiatric care that cannot be provided at the ACI but only at the Forensic Unit. He stated that when a person leaves a hospital setting, the standard of care requires discharge planning and the continuation of treatment received in the hospital upon release. In Dr. Ingall's opinion, that kind of adequate treatment does not exist today at the ACI any more than it did in 1999 when Mr. Nem was first transferred to the Forensic Unit. Dr. Ingall claimed that it is an extraordinary event for an inmate to receive psychotropic medication at the ACI whereas at the Forensic Unit, everyone receives psychotropic medication and everyone takes it. He stated that the discharge plan is critical, and there would be no way for the ACI to implement a proper discharge plan from the Forensic Unit to ensure that Mr. Nem continued to take his medication.
Dr. Ingall testified that the ACI is not a therapeutic milieu and that, if returned there, Mr. Nem would require a specialized psychiatric unit with a plan not unlike the psychiatric unit at the Forensic Unit. He believed that ultimately Mr. Nem might be able to be released into intensive community-based psychiatric treatment if he could be provided with a mobile medication team that would administer medication to him 1-2 times a day and immediately rehospitalize him without bureaucratic resistance upon the first sign of noncompliance. He admitted that Mr. Nem is dangerous by history and that makes him different than others with the same psychiatric diagnosis. According to Dr. Ingall, however, discharging Mr. Nem back to the ACI would be analogous to discharging a patient with malaria from a hospital back to a swamp.
Dr. Ingall acknowledged that since his transfer to the Forensic Unit, Mr. Nem has been stable and compliant with his medications for many months and that his stability makes it more likely that he will be more compliant with his medication in the future. He thought, however, that, notwithstanding his progress in an institution with fine mental health services, returning Mr. Nem to the stressful environment at the ACI without adequate treatment where noncompliance with treatment is a choice given to the inmate would increase the risk that he would become noncompliant with his medications in the future and then acutely psychotic.
Dr. Ingall opined that to return Mr. Nem to the ACI without adequate treatment could result in "kindling" — bouts of recurrent psychotic episodes that, like a small fire that begins slowly and then spreads faster and faster until it is a full blown blaze, grow more intense with each new occurrence. It was his opinion, to a reasonable degree of medical certainty, that it would be highly likely that if Mr. Nem were returned to the ACI, he would have a recurrent psychotic episode and decompensate quickly within a few months. Dr. Ingall drew support for this opinion from the past where the Department of Corrections allowed Mr. Nem to experience psychiatric decompensation at the ACI on four to five occasions, with the last episode that resulted in his emergency transfer to the Forensic Unit in September 1999 being the most profound.
Dr. Ingall thought that Mr. Nem's complaints about side effects in the past did not always correlate with the medications he was taking and could well have indicated evidence of noncompliance arising out of his mental illness. He thought that, notwithstanding those complaints, Mr. Nem should have stayed on the medications in question rather than being prescribed new medication or being allowed simply to choose not to take any medication and then to decompensate. According to Dr. Ingall, Mr. Nem's case is distinct and presents issues not present with just any inmate with mental illness. Dr. Ingall observed that Mr. Nem has a clear and unmistakable history of regression into a primitive state at the ACI again and again with inadequate treatment in a system that is not equipped to handle his psychiatric condition. Indeed, in the opinion of Dr. Ingall, the ACI is one of the worst places clinically to treat a person like Mr. Nem who has a major psychiatric disorder.
Following Dr. Ingall's testimony, the Mental Health Advocate presented the testimony of Alan B. Feinstein, the Supervising Clinical Psychologist at the ACI for the Department of Corrections. He serves as the Director of Mental Health Services (which includes mental health services other than psychiatric services). The staff he supervises includes four clinical social workers and four to five clinical psychologists responsible for the mental health needs, if any, of over 3000 inmates. According to Mr. Feinstein, there are about 200 inmates at the ACI with major mental illnesses such as schizophrenia, schizoaffective disorder and bipolar affective disorder. He acknowledged that there are psychotic inmates at the ACI who are not receiving any medication. Of the fifty inmates with mental illness like Mr. Nem, about 45 of them receive medication. The vast majority of those people are stable and can make it from day to day without their mental problems causing disciplinary problems that land them in segregated confinement. His department engages in crisis intervention with inmates, handles referrals for medication and treatment from correctional officers, members of the inmate's family or community or other inmates for inmates with mental health problems, and renders the appropriate treatment or makes the appropriate referrals to prison psychiatrists of inmates in need of medication. Mr. Feinstein also handles the diversion of defendants into mental health programs, rather than incarceration, at the request of the Court where the treatment needs of such persons can better be provided in some other environment.
In describing the psychiatric services offered inmates at the ACI, Mr. Feinstein testified that the Department of Corrections does not employ a full-time psychiatrist. Dr. Bauermeister works part-time and is usually the psychiatrist who determines whether the Department of Corrections should petition for the transfer of any inmate to the Forensic Unit. He generally works in the high security and intake facilities. Three other part-time psychiatrists cover the women's facility, the medium and maximum security facilities and minimum security and work release. The duty of the psychiatrists is to assess an inmate's need for medication and prescribe any needed medication, monitor an inmate's response to medication and evaluate inmates who are placed in crisis management status. Only prison psychiatrists are authorized to release an inmate from crisis management status or petition for the transfer of inmates to the Forensic Unit.
According to Mr. Feinstein, if an inmate displays a serious mental health problem while incarcerated, that problem might come to the attention of mental health personnel primarily through one of three ways: a family member, a correctional officer who observes an inmate's bizarre behavior or a nurse or other member of the medical staff. It also could be flagged by a member of the community or another inmate. Correctional officers have had limited training with regard to mental health issues, including interacting with such inmates, watching for signs of suicide and identifying overt signs of mental illness. There is no ongoing mental health training required of correctional officers. If an inmate is referred to the prison psychologists for a mental health problem, the inmate is required to be seen by a social worker or prison psychologist within 24 hours. Mr. Feinstein acknowledged, however, that an inmate could live in the general population for a period of time with mental health symptoms.
If an inmate is awaiting trial and has serious mental health issues, efforts are made to get that person into community-based treatment (including hospitalization, mobile treatment team, etc.). If the person is charged with a serious crime, like Mr. Nem, and community-based treatment is not an option, then the ACI has an obligation to treat the inmate in-house. The staff would assess the problem, perhaps contact past medical providers and make a referral to the prison psychiatrist who could see the inmate and determine the appropriate treatment.
Once referred to a prison psychologist, the psychologist would determine if a further referral to a prison psychiatrist were in order. If a referral were made, a designated member of the psychiatric staff would be required to see the inmate within 48 hours. The prison psychologists generally order inmates experiencing suicidal tendencies or psychiatric decompensation, who cannot remain in the general prison population, to be transferred to the psychiatric unit and placed in psychiatric observation or crisis management status. Sometimes they refer such inmates to a prison psychiatrist prior to transfer. To accomplish the transfer, the cell extraction team that is used to forcibly remove inmates from cells for security or disciplinary purposes is employed. A graphic description of this kind of cell extraction, used even for mentally ill patients, can be found in In Re: James Steven Gonsalves, M.P. 94-4610 (R.I. Super. Ct.) (March 6, 1996) (Clifton, J.).
A psychiatric observation cell includes a single bunk, toilet and sink with large windows from which an inmate is to be observed by a correctional officer every 15 minutes. The inmate in such a cell is allowed to be clothed and have linens and reading material. A psychiatrist generally offers medication to an inmate in psychiatric observation but the inmate is permitted to refuse the medication. Inmates sometimes act stable, regardless of whether they are in fact stable, so they can return to the general population. Inmates who refuse medication can remain in psychiatric observation for months.
Crisis management status is more restrictive than psychiatric observation. It is not designed to be therapeutic, but to keep people alive. It is also referred to as being placed on suicide watch. Under the crisis management policy of the Department of Corrections, inmates are transferred to crisis management status when they attempt to harm themselves or others or when they make threats to do so. Inmates also may be transferred to crisis management status when they are experiencing psychiatric decompensation. A correctional officer is obligated to alert a member of the psychology staff during working hours as soon as possible if he or she finds an inmate engaged or threatening to engage in self-injurious behavior. The mental health staff is to evaluate the inmate and make any further disposition, including placing the inmate on crisis management status. Once placed on such status, a psychiatrist is required to evaluate the inmate within 48 hours. The psychiatrist has sole discretion to order the release of an inmate from crisis management status.
The cells for crisis management status are the same as psychiatric observation cells, but historically, inmates in crisis management status are not permitted to wear clothing other than underwear. Recently, Mr. Feinstein has changed this policy by purchasing suicide proof garments for these inmates. Sometimes these inmates are provided mattresses but they are not allowed to have visitors or reading or writing materials. Crisis management status is not designed to be therapeutic. A graphic description of such cells is contained in In re: James Steven Gonsalves, M.P. 94-4610 (March 16, 1996) (Clifton, J.).
There are a very limited number of cells used for psychiatric observation or crisis management status — four in the hospital section and four additional cells in the intake section that can be used if needed. If there are more inmates in need of these cells than space, the inmates are housed in segregation with a correctional officer posted to keep the inmates under constant observation, even though the Department of Corrections' policy on crisis management does not permit segregation cells to be used for crisis management. (Ex. 11).
If an inmate's psychological symptoms do not resolve after transfer to crisis management status or the psychiatric observation unit, it is rare for Dr. Bauermeister, or any other prison psychiatrist, to recommend that the inmate be transferred to the Forensic Unit. Dr. Feinstein admitted that he occasionally has had professional disagreements with Dr. Bauermeister regarding this issue. Under the ACI's policy for crisis management, a referral to the Forensic Unit must be made if, in the opinion of the attending prison psychiatrist, "the inmate needs more intensive psychiatric treatment which the ACI is unable to provide." Based on the history in the case of Mr. Nem, such a transfer request would not necessarily be made even if an inmate were in a state of severe psychosis and had experienced multiple episodes of psychiatric decompensation.
According to Mr. Feinstein, the ACI does not have a policy that would allow it to medicate an inmate involuntarily. He admitted that involuntary medication is usually done in a hospital setting. To his knowledge, it only had been ordered on an emergency basis at the ACI on four occasions. The Department of Corrections is exploring the adoption of a policy to allow it to involuntarily medicate inmates, but it is concerned with the medical and legal implications of such a policy. These concerns include not knowing how a given inmate may respond to the medication and the risks associated with unknown side effects, especially if the prison knows little about an inmate's prior psychiatric history. Mr. Feinstein said that if an inmate comes to the ACI with a history of medication working well where side effects can be managed, there might be more wisdom to medicating these persons against their will in a medically sound manner should they not remain compliant with the indicated medication.
Dr. Feinstein testified that he had personal contact with Mr. Nem at the ACI. He confirmed that Mr. Nem had experienced at least four psychiatric decompensations while incarcerated at the ACI. He acknowledged that Nem may have had additional episodes that either led to his transfer into punitive segregation rather than the psychiatric observation unit or resulted in him being quiet, withdrawn and afraid in his cell. He further acknowledged that an inmate in psychotic decompensation needs diagnosis, treatment and medication. When asked pointedly whether it was clinically appropriate to transfer Mr. Nem back to the ACI, he would not give any opinion; he said that he had no opinion because he had not seen Mr. Nem in two years.
Mr. Feinstein further testified about what services would be provided Mr. Nem were he to be transferred back to the ACI. He stated that the Department of Corrections would secure his treatment records from the Forensic Unit. Upon his return, he would be placed in the psychiatric observation unit unless he threatened to be a danger to himself or others. In that case, he would be placed in crisis management status. He would be seen by Mr. Feinstein and/or Dr. Bauermeister. A determination would be made about the length of time he should be kept in psychiatric observation. Thereafter, Dr. Feinstein said he would recommend that Mr. Nem be housed in a smaller block with 20-30 inmates to provide for better supervision and less environmental stimuli. Obviously the classification determination would depend in part on the ultimate sentence Mr. Nem receives. Traditionally, mental health patients often are determined to require higher security.
In addition, the nursing staff would be instructed to make sure that Mr. Nem took his medication (by watching him swallow it) and notifying Mr. Feinstein immediately if he refused his medication. At that point, efforts would be made to talk him back into taking his medication, a determination would be made about whether to transfer him to psychiatric observation and a prison psychiatrist would be alerted. Correctional officers would be notified to alert mental health services personnel right away if Mr. Nem manifested any problems. Mr. Nem would be seen daily by mental health staff at the beginning and then weekly or monthly thereafter.
Mr. Feinstein acknowledged, however, that Mr. Nem could be permitted to decompensate again if transferred back to the ACI because the prison lacks the power to medicate inmates involuntarily. If Mr. Nem did decompensate, there would be no request to transfer Mr. Nem back to the Forensic Unit unless Dr. Bauermeister ordered that transfer or unless a Court order provided for an immediate transfer in the event of decompensation.
He indicated that, as time goes on, the Department of Corrections provides more and more psychological services, as evidenced by the recent increases in staff social workers and psychologists, the greater presence of community service providers in the prison and the increase in group therapy rather than just individual treatment. He acknowledged, however, that the prison is not designed to be a therapeutic or rehabilitative environment for people with mental health problems but is designed principally to provide security, custody and control of inmates. Currently, according to Mr. Feinstein, there is no unit to treat chronically mentally ill patients, like Mr. Nem, "behind the walls."
The Department of Corrections presented no witnesses. No party presented testimony from Dr. Bauermeister, the psychiatrist at the Department of Corrections who treated Mr. Nem while he was incarcerated there in 1998 and 1999 and who finally petitioned for his emergency transfer to the Forensic Unit in September 1999 (after Nem had experienced at least four periods of psychotic decompensations in prison and his criminal defense attorney and expert psychiatrist got involved). In addition, no party presented the testimony of Dr. Wagner, the psychiatrist at the Forensic Unit who treated Mr. Nem there from September 1999 until the Doctor's departure from the Forensic Unit in May 2001.
 LEGAL ANALYSIS A.
The issue before this Court with respect to the petition filed by MHRH to transfer Mr. Nem from the Forensic Unit back to the ACI is whether the evidence adduced at the hearing on the transfer petition is sufficient to warrant such a return transfer. MHRH takes the position that its transfer request should be granted because it has no obligation to continue to treat Mr. Nem when he no longer needs inpatient hospitalization and has been stabilized psychiatrically on medication that he indicates he is willing to continue to take at the ACI. The Mental Health Advocate takes a contrary position, on behalf of Mr. Nem, that the Forensic Unit should continue to treat Mr. Nem, as he has not sufficiently recovered his mental health and is still in need of mental health services afforded psychiatric inpatients at the Forensic Unit that cannot be provided in a correctional facility. To address these issues, this Court first must examine the applicable provisions of the Mental Health Law, R.I. Gen. Laws §§ 40.1-5.3-1 et seq., to determine the standards that govern this Court's consideration of the pending transfer petition.
Under the Mental Health Law, it is incumbent upon the Director of MHRH to "maintain . . . an appropriate facility for the confinement of persons committed to its custody" and to "provide for the proper care, treatment, and restraint of all such persons." R.I. Gen. Laws §40.1-5.3-1 (a). At present, that facility is the Forensic Unit of the Eleanor Slater Hospital. The cost of such care, maintenance and treatment shall be borne by MHRH unless the inmate has the financial resources dictated by statute. Id. § 40.1-5.3-1 (b). This obligation includes the duty to care for and treat those persons transferred to the Forensic Unit from the ACI for specialized mental health services and psychiatric inpatient services that cannot be provided in a correctional facility, see R.I. Gen. Laws § 40.1-5.3-7, as well as those persons deemed incompetent to stand trial or acquitted on grounds of insanity under R.I. Gen. Laws §§ 40.1-5.3-3 and 40.1-5.3-4, respectively.
Under section 6 of the Mental Health Law, either the Director of MHRH or the Director of the Department of Corrections may file a petition with the Court to transfer an inmate who is awaiting trial or incarcerated for conviction of a crime from the ACI to the Forensic Unit. Id. §40.1-5.3-6. Notice of the petition must be provided to the inmate or his or her counsel, the Director of MHRH and the Attorney General. Id. §40.1-5.3-7 (a). The Court may order an examination of the person. Id. § 40.1-5.3-6. Such an inmate is entitled to a hearing at which the parties may introduce evidence bearing on the mental condition of the person. Id. § 40.1-5.3-7 (a). The administrative procedures of the Superior Court that are applicable to emergent and non-emergent petitions filed pursuant to section 6 of the Mental Health Law are outlined in Administrative Order No. 86-1.[1]
The standard governing the Court's consideration of a petition to transfer an inmate from the ACI to the Forensic Unit under section 6 is set forth in section 7 of the Mental Health Law, as follows:
 If the Court finds by clear and convincing evidence that the person is mentally ill and requires specialized mental health care and psychiatric inpatient services that cannot be provided in a correctional facility, the court may order the transfer of the prisoner from the adult correctional institutions, to be detained in the facility provided for in section [1 of the Mental Health Law].
Id. § 40.1-5.3-7 (b). Once transferred, an inmate has a statutorily prescribed right to treatment, as follows:
 Any person who has been committed or transferred to a facility for care and treatment pursuant to this chapter shall have a right to receive the care and treatment that is necessary for and appropriate to the condition for which he or she was committed or transferred and from which he or she can reasonably expect to benefit. Each person shall have an individualized treatment plan. This plan shall be developed by appropriate mental health professionals, including a psychiatrist. Each plan must be developed within ten (10) days of a person's admission to a facility.
Id. § 40.1-5.3-14. The Mental Health Law further provides that an order of transfer entered pursuant to section 7 shall be for and during the term of the prisoner's sentence. Id. § 40.1-5.3-8.
Section 9 of the Mental Health Law also makes provision for a return transfer of an inmate from the Forensic Unit to the ACI under the following circumstances:
 When any person transferred [to the Forensic Unit or other facility referenced in section 1] pursuant to section [7] has sufficiently recovered his or her mental health, he or she may, upon petition of the [D]irector [of MHRH] and by order of a justice of the superior court in his or her discretion, be transferred to the place of his or her original confinement, to serve out the remainder of his or her term of sentence.
Id. § 40.1-5.3-9. To secure a return transfer, the Director of MHRH must prove, by a preponderance of the evidence, at any hearing requested by the inmate with respect to a transfer petition, that he or she has sufficiently recovered his or her mental health (in that there is no longer clear and convincing evidence that the inmate is mentally ill and needs specialized mental health care and psychiatric inpatient services that the ACI cannot provide) and that the Court should exercise its discretion to transfer the inmate back to the place of his or her original confinement. See In Re: Kevin Clark, M.P. 99-1601, consolidated with In Re: Rahsaan Muhammed, M.P. 99-1602 and In re: Pheakiny Nem, M.P. 99-4546 (R.I. Super. Ct.) (June 21, 2000) (Savage, J.).
In construing these provisions of the Mental Health Law, it is clear that an inmate who clearly needs specialized mental health care and psychiatric inpatient services that cannot be provided at the ACI may be transferred to the Forensic Unit. In this way, the Legislature sought to ensure that mentally ill persons who are incarcerated at the ACI will receive those essential specialized mental health care services afforded psychiatric inpatients at the Forensic Unit that the ACI cannot provide. Once transferred from the ACI to the Forensic Unit, the inmate is to receive those services dictated by his or her treatment plan and is not to be transferred back to the ACI until the inmate has "sufficiently recovered his or her mental health." Implicit in the term "sufficient recovery" is the notion that the inmate will have satisfied all of the criteria for discharge contained in his or her treatment plan. Also implicit in that term is the notion that the recovery is substantial enough that whatever mental health care needs remain as to the inmate, as outlined in the discharge summary prepared by the Forensic Unit, the ACI can meet those needs. A mentally ill inmate may have improved his or her mental health after treatment in the Forensic Unit and not have the same need for psychiatric inpatient services that he or she had when transferred from the ACI to the Forensic Unit and yet still clearly be in need of the specialized mental health care services that are rendered to psychiatric inpatients at the Forensic Unit because those services are not provided at the ACI.
The Mental Health Law vests the Court with the responsibility of making that determination and gives the Court the ultimate discretion, considering all of the evidence relevant to the petition to transfer, to decide whether to order the requested return transfer. Certainly the inmate's position with respect to the transfer issue and the question of whether a transfer is in the inmate's best interest are relevant to any transfer decision. See Department of Social Welfare v. Genereux,201 A.2d 914, 917-18 (R.I. 1964) (citing prior statute).
 B.
It is clear to this Court from the evidence presented at the hearing on MHRH's petition to return Mr. Nem to the ACI that, as a result of the high quality of mental health services provided to Mr. Nem at the Forensic Unit since his transfer there from the ACI in September 1999, Mr. Nem has improved dramatically. There is no question that he has been psychiatrically stabilized. He no longer has any overt signs of active psychosis, disorganized thoughts, or paranoia and evidences greatly diminished symptoms of mood disorder and post traumatic stress disorder. He is taking his medications in the supportive milieu of the Forensic Unit, as prescribed, and has been on the same medications, with no unmanageable side effects, for almost two years. He has some better understanding of his illness and need for the medications and, with daily support and daily monitoring in a structured, therapeutic environment, is able to maintain his medication regiment voluntarily.
This progress is illustrated by the marked contrast between Mr. Nem's physical appearance and demeanor in Court in 2001 during the hearing on the instant petition of MHRH to transfer Nem from the Forensic Unit back to the ACI and his earlier appearance in Court in 1999 prior to his transfer to the Forensic Unit. The man who previously looked disengaged and sickly and hung his head later appeared upright, healthy and responsive. Those changes obviously were related directly to the fine mental health care and treatment that Mr. Nem has received at the Forensic Unit in the interim.
Notwithstanding his progress, however, this Court is clearly convinced that Mr. Nem has not sufficiently recovered his mental health to warrant his return transfer to the ACI. Mr. Nem is clearly still in need of specialized mental health care services that are rendered to psychiatric inpatients at the Forensic Unit that cannot be provided at the ACI. Mr. Nem's need in this regard is evident from a review of his treatment plan and the progress reports and psychological reviews generated by mental health care providers at the Forensic Unit and an exploration of the inadequacies of his past mental health treatment and the mental health services he could expect in the future at the ACI.
The treatment plan developed for Mr. Nem at the time of his admission to the Forensic Unit in September 1999 identified four problems that necessitated Mr. Nem's receipt of hospital-level care: (1) his need for psychiatric stabilization and recompensation; (2) his condition of acute psychosis with major depressive symptoms, including disorganized thoughts, paranoia and a mood disorder; (3) his post traumatic stress disorder; and (4) his noncompliance with medication and treatment. His treatment plan provided for medication and other treatment modalities to address these problems. The plan provided for the termination of treatment as to each of these four problems if Mr. Nem (1) achieved psychiatric stabilization; (2) showed recompensation of his psychotic symptoms, organized goal-directed thoughts, an absence of paranoia and a more stabilized mood; (3) improved his symptoms of post traumatic stress disorder; and (4) accepted his medication for two weeks without prompting and agreed that he would accept medication and treatment at the ACI. During the course of his stay at the Forensic Unit, Mr. Nem achieved psychiatric stabilization and recompensation and appeared to rid himself of active signs of psychosis, paranoia, and disorganized thoughts. He also displayed a significant lessening of his symptoms of post traumatic stress disorder. He accomplished these goals in large part by taking his prescribed medication, once the correct medication was determined.
The problem, however, is that Mr. Nem has been able to achieve medication compliance and the lessening of his psychiatric symptomology solely as a result of the structured, therapeutic environment of the Forensic Unit. While he has accepted the medication voluntarily (as opposed to the Forensic Unit having to administer the medication to him involuntarily), that has occurred as a result of him working one-on-one in a less stressful environment with psychiatrists and mental health staff members who constantly and consistently educate him about the nature of his mental illness and his need for the medication, monitor any side effects and offer positive reinforcements for his taking the medication. They have worked hard to involve him in activities on the ward and engage him in various forms of therapy.
Notwithstanding all of their efforts, staff members working on the Forensic Unit have said throughout his course of stay that he has only "some" understanding of his illness, his need for treatment and the side effects of his medication. While he can identify the name, dosage and indications for his medication, there is no evidence that he yet fully appreciates the importance of compliance with his medication regimen, particularly on an ongoing basis, and would continue to take the medication voluntarily without continuous education, monitoring and support. Significantly, staff at the Forensic Unit have noted repeatedly that Mr. Nem is fully compliant with treatment in a structured setting "but that he is likely to become noncompliant with his medication in an unstructured setting."
In addition, increased stress in his environment, even in the therapeutic milieu of the Forensic Unit, has caused him to manifest greater symptomology of post traumatic stress disorder, mood disorder and depression which in turn have caused him to withdraw from the very activities that help enhance his mental well-being and support his taking of medication. This can be noted, in particular, at the times when he went to Court, was facing imminent trial on his underlying criminal case, when his mother was ill, and when Dr. Wagner (the psychiatrist with whom he had a long-term relationship on the Forensic Unit that everyone agreed was so important to his mental health) told Mr. Nem that he would be leaving the Forensic Unit. Any prospect of a return to the ACI greatly increases this stress and associated psychiatric symptomology. Staff have repeatedly noted his fear of such a return to the ACI and their concerns that the prospect of such a return would cause a dramatic increase in his anxiety level that could lead to a recurrence of his prior symptoms of post traumatic stress disorder. Shortly before he left the Forensic Unit, Dr. Wagner specifically warned that "recurrent PTSD syndrome is possible in the future."
In reviewing Mr. Nem's treatment plan, therefore, it cannot be said that he has met the criteria for termination of treatment in the Forensic Unit that MHRH itself has established. His treatment plan unequivocally requires that Mr. Nem accept medication at the Forensic Unit for two weeks without prompting. It also mandates that he will agree to accept medication upon any return to the ACI before his inpatient treatment for medication noncompliance at the Forensic Unit can be terminated. The obvious intent of these provisions is to ensure that Mr. Nem understands his mental illness and need for medication sufficiently so that he will accept his medication without prompting at the ACI upon his return.
At the hearing on the transfer petition, however, MHRH presented no evidence that Mr. Nem has ever taken his medication at the Forensic Unit without prompting. Indeed, the records suggest that Mr. Nem has received extensive support and counseling surrounding his taking of medication and that his reported side effects still continue to be an issue that staff must address on a daily basis to ensure his continued compliance.
MHRH likewise failed to persuade this Court that it should give much weight to statements in the medical record, attributed to Mr. Nem, that indicate that he would accept medication at the ACI if he were transferred back there. Curiously, none of these statements appeared in his Forensic Unit records until late 2000, well after MHRH requested his return transfer. At the hearing, no witness testified as to such statements nor did the record reveal any information about the circumstances under which Mr. Nem made any such statements. Mr. Nem's significant history of noncompliance with medication outside of a structured therapeutic environment (i.e., in the community prior to his incarceration and at the ACI prior to his transfer to the Forensic Unit) and the record notations about his profound fear and anxiety connected with a return transfer (and the prospect, upon a transfer back to the ACI, of recurrent post traumatic stress disorder) make any such statements suspect. In the past, he often made representations that he understood his need for treatment and medication and then later refused to take the medication or articulated troublesome side effects that led others to accede to his requests to stop taking the medication.
It is true that Mr. Nem has taken his medication voluntarily for over a year at the Forensic Unit. While that might suggest a higher likelihood of continued compliance in a therapeutic environment, it is not an accurate or reliable predictor of continued compliance in the non-therapeutic prison environment. Dr. Surti clearly testified that the risk that Mr. Nem will not be compliant with his medication is "very real."
In addition, while the evidence suggests that in the Forensic Unit Mr. Nem meets the other criteria for termination of treatment set forth in his treatment plan (i.e., Nem is psychiatrically stabilized; achieved recompensation of his psychotic symptoms and displays organized goal-directed thoughts, an absence of paranoia and a more stabilized mood; and demonstrates improvement in his symptoms of post traumatic stress disorder), it is not at all clear that he would meet these criteria as of the moment of any transfer back to the ACI. As noted in his medical records from the Forensic Unit, the mere occurrence of the transfer could lead to a dramatic increase in his anxiety and the recurrence of post traumatic stress disorder. That, in turn, could cause noncompliance with his treatment regimen and a substantial increase in his depressive symptoms.
It cannot be said, therefore, that Mr. Nem presently satisfies all of the Forensic Unit's own criteria for the termination of treatment under the terms of his treatment plan. Indeed, MHRH presented no expert testimony at trial that Mr. Nem met the treatment plan's criteria for the termination of treatment. The most its experts could say is that Mr. Nem no longer needs the emergency hospitalization that he needed in September 1999 when he manifested acute psychosis and was transferred to the Forensic Unit for emergency hospital-level psychiatric treatment. MHRH's position is not so much that Mr. Nem has no need for specialized mental health services provided to psychiatric inpatients at the Forensic Unit but that legally, once an inmate no longer has a need for emergency hospital-level services that necessitated his or her transfer to the Forensic Unit in the first instance, he or she should be transferred back to the ACI regardless of whether the mental health services he or she requires at the time of that transfer can be provided at the ACI. That argument flies in the face of the plain language of the Mental Health Law and MHRH's obligation to provide inmates with those specialized mental health services afforded to psychiatric inpatients if those services cannot be provided at the ACI.
Even assuming, arguendo, that Mr. Nem meets all of the criteria for termination of treatment at the Forensic Unit, he cannot be deemed to have sufficiently recovered his mental health unless the ACI is in a position to provide him with the mental health treatment he needs to continue being compliant with his medication and to sustain his current level of psychiatric stability. This Court finds, clearly and convincingly, that the ACI is not positioned to provide Mr. Nem with those specialized mental health services afforded him as a psychiatric inpatient at the Forensic Unit that are essential to him remaining stable psychiatrically and compliant with his medications.
As identified by Dr. Krupp, the ACI cannot provide Mr. Nem with the following services that have been available to him at the Forensic Unit: round the clock nursing care, administration of medication and monitoring for side effects, treatment for conditions that might be exacerbating his psychiatric problems, management of violent tendencies and more frequent assessment, interaction and follow-up in the provision of mental health services. It cannot provide him with the necessary one-on-one education surrounding the nature of his mental illness and his need for treatment involving a psychiatrist, psychologists and other mental health workers, a long-term trusting relationship with a psychiatrist, daily monitoring for signs and symptoms of psychosis or depression or medication side effects, daily group activities in a therapeutic setting and regular expressive therapy and individual counseling. The mission of the ACI simply does not include sufficient provision of these types of therapeutic mental health services, notwithstanding the prison's recent efforts to upgrade its care and Mr. Feinstein's willingness to try to afford Mr. Nem appropriate care.
Yet it is precisely these specialized mental health services that MHRH deemed critical to the restoration of Mr. Nem's mental health when it allowed him to be transferred to the Forensic Unit in the first instance; those services, clearly delineated as necessary in Mr. Nem's treatment plan, remain no less critical for the maintenance of those treatment objectives and his psychiatric stability. This is not a case where Mr. Nem has been afforded treatment at the Forensic Unit that now will ensure that he will be compliant with his medication regiment at the ACI without the need for those specialized mental health services. It is a case where the continued provision of those specialized mental health services afforded psychiatric inpatients at the Forensic Unit are critical to his continued compliance with his medications and his continued psychiatric stability.
While MHRH made a good case for Mr. Nem no longer needing emergency psychiatric hospitalization at the Forensic Unit (as he did when he was first transferred there from the ACI in a state of acute psychosis and decompensation), it failed to make a good case for discharging him back to the ACI. It presented neither the testimony of Dr. Bauermeister (the prison psychiatrist who originally allowed Mr. Nem to decompensate at least four times before recommending his transfer to the Forensic Unit) nor Dr. Wagner (who treated Mr. Nem upon his transfer to the Forensic Unit and for two years thereafter) to opine that the ACI could provide Mr. Nem those specialized mental health services afforded him as a psychiatric inpatient at the Forensic Unit, as dictated by his treatment plan, or that it would be clinically appropriate to transfer Mr. Nem back to the ACI.
While MHRH presented the testimony of Dr. Krupp and Dr. Surti in support of its transfer petition, it was clear that they both had limited direct clinical experience with Mr. Nem at the Forensic Unit, had limited knowledge about the ACI's ability to provide him adequate mental health services and stopped short of opining that the ACI could provide adequate mental health services for him. They acknowledged that the standard of care and MHRH's own policy (Ex. 9) dictates that a discharge plan be in place before discharge of a patient from the Forensic Unit, but indicated that no such plan had yet been prepared as to Mr. Nem. Indeed, MHRH presented no evidence as to what the discharge plan would require and whether it would sanction discharge of Mr. Nem to the ACI. It adduced no evidence as to whether the ACI could meet the terms of any such discharge plan. Mr. Feinstein, whose testimony was presented by the defendant and who was the witness most conversant with the ACI's ability to treat Mr. Nem, declined to answer the question of whether it would be clinically appropriate to discharge Mr. Nem from the Forensic Unit to the ACI. Dr. Ingall, the only witness to address that issue on its merits, convincingly testified that it would not be clinically appropriate to discharge Mr. Nem from the Forensic Unit to the ACI, especially in the absence, at the time of requested transfer, of the discharge summary required by the standard of care and MRHR's own policy.
The absence of evidence of a discharge summary prepared by the Forensic Unit and the absence of evidence that the ACI could meet the terms of any such discharge plan convinces this Court that MHRH could not put in place a discharge summary governing the discharge of Mr. Nem from the Forensic Unit with which the ACI could comply. MHRH failed to present the essential evidence, therefore, that is a necessary predicate to any determination by this Court that Mr. Nem has sufficiently recovered his mental health and is no longer in need of those specialized mental health services afforded to psychiatric inpatients at the Forensic Unit.
Accordingly, there remains clear and convincing evidence that Mr. Nem is mentally ill and requires those specialized mental health services afforded psychiatric inpatients at the Forensic Unit that the ACI cannot provide. MHRH's petition to transfer Mr. Nem from the Forensic Unit back to the ACI, therefore, must be denied.
 C.
Moreover, this Court has the discretion under the Mental Health Law to deny MHRH's petition to transfer Mr. Nem back to the ACI, even in the absence of sufficient evidence that he is still in need of specialized mental health services and psychiatric inpatient treatment at the Forensic Unit that cannot be provided at the ACI. "The term `discretion' imports action taken by the trial justice in light of reason. Due regard is given for what is right and equitable under all of the circumstances and the law." State v. Allen, 433 A.2d 222, 225 (R.I. 1981). It is clear that what is right and equitable, and in the best interest of Mr. Nem and society, is to deny MHRH's petition to transfer him back to the ACI and to allow him to continue to reside at the Forensic Unit. In that way, he can receive those mental health services necessary for his continued psychiatric stability that may be critical to any future prospect of rehabilitation and his safety and that of other people.
This Court cannot, in good conscience, allow Mr. Nem to be transferred back into an environment that previously failed to treat his mental illness appropriately and allowed him to go into repeated episodes of acute psychosis and decompensation, to the detriment of his physical and mental well-being. The ACI is simply ill-equipped to afford Mr. Nem the specialized mental health services he requires, even though it is a department that has made incremental progress, at least in part through the efforts of Mr. Feinstein, in attempting to improve those services.
It cannot be seriously disputed that Mr. Nem's mental health will likely deteriorate quickly if he is transferred back to the ACI. As Dr. Ingall aptly noted, the best predictor of the future is the past. The unstructured non-therapeutic prison environment is simply not set up to support his medication regimen and provide him with the other mental health services critical to his psychiatric stability. As Dr. Ingall vividly described, returning Mr. Nem to the ACI would be like discharging a person with malaria from a hospital back to the swamp.
The combination of a return to a stressful environment that Mr. Nem fears and the absence of therapeutic support upon his return is highly likely to result in him experiencing increased symptoms of post traumatic stress disorder, depression and psychosis and noncompliance with his medication. The prison is not set up to intervene quickly should Mr. Nem discontinue his medication (notwithstanding Mr. Feinstein's good faith intent to have it be otherwise). The proof of that fact is in the ACI's past treatment of this very inmate.
In fact, the prison philosophy, as demonstrated by Dr.Bauermeister's prior treatment of Mr. Nem, is to allow the inmate to make the decision as to whether to take his medication, even when that inmate's mental illness makes him incapable of making a sound decision. That philosophy, as profoundly demonstrated in the case of Pheakiny Nem, is clinically inappropriate as it punishes the inmate for his mental illness and deprives him of the very treatment that is essential for his psychiatric stability.
In such an environment, it is likely that Mr. Nem will continue to experience side effects or think he is experiencing side effects from the medication and thus want to change or discontinue his medication. He has battled such side effects constantly in the less stressful environment of the Forensic Unit and has needed aggressive monitoring and counseling to succeed in not letting them interfere with his medication compliance. There is simply not the level of therapeutic support necessary, under the stressful environmental conditions of the prison, to ensure that Mr. Nem will continue to take his medication in those circumstances. No provision exists for involuntary administration of the medication (which really would be inappropriate if proper therapeutic support services could accomplish the same end). Ultimately, he would be allowed to choose not to take the medication that he so desperately needs.
Not taking the medication would likely land him in the psychiatric observation unit, crisis management status or in segregation — cells that only could serve to punish him and increase his psychiatric symptomology. There is no precedent for transferring Mr. Nem to the Forensic Unit under such circumstances — simply for not taking his medication voluntarily — where he has not yet decompensated and fallen into a state of acute psychosis. Moreover, if a decision to transfer were made by the ACI at the first juncture when Mr. Nem refused his medication, then it would validate the need for him to remain at the Forensic Unit at this time (as it would be evidence that the problem of medication noncompliance could not be dealt with adequately in the prison environment).
Sooner or later, however, it is likely that Mr. Nem would decompensate. In the process, Mr. Nem could well experience a deeper psychotic episode than he previously experienced that could continue his downward psychiatric spiral and ultimately impede any future rehabilitation. There would be no guarantee that Mr. Nem would be transferred to the Forensic Unit for appropriate treatment even if he were in such an acute psychotic state. After all, it took at least four psychotic episodes in the past (with the last one being particularly acute) and a visit from counsel and a defense expert to prompt such a request for transfer by the ACI, even in the presence of support for such a transfer from many mental health staff members at the ACI.
In exercising its discretion to allow Mr. Nem to remain housed at the Forensic Unit, this Court recognizes that MHRH has a legitimate policy objective in petitioning to have Mr. Nem transferred back to the ACI; it does not want to be in the business of dedicating its limited, high-cost mental health resources to inmates from the ACI who should be able to be treated by the Department of Corrections without the need for expensive psychiatric hospitalization in the Forensic Unit. It recognizes that it cannot even provide many of those services to needy persons without a criminal record or pending criminal charges. Its petition must fail, however, not because it is wrong in this objective, but because the ACI has yet to develop an appropriate level of mental health services for inmates behind the walls. In this Court's view, the Legislature made it the Forensic Unit's obligation to treat such inmates if, in the discretion of the Court, they could not be treated adequately at the ACI — regardless of whether these services are costly and extend beyond emergency hospitalization.
Unless and until the Department of Corrections is prepared to offer greater therapeutic services to inmates with serious mental health problems, this pattern may continue. In a national survey undertaken by the Bureau of Justice Statistics in 2000 and published in 2001 on mental health treatment in state prisons, it was noted that Rhode Island is one of only three states that lacks a special psychiatric confinement facility; unlike the vast majority of states, it places inmates who need special mental health services or psychiatric confinement in its prison infirmary or special needs units or requests (in only very rare circumstances) that they be transferred to the Forensic Unit. See Bureau of Justice Statistics Special Report, "Mental Health Treatment in State Prisons, 2000" (July 2001). The ACI chooses to rely, instead, on rather barbaric psychiatric observation, crisis management and segregation cells, limited psychiatric and mental health services and emergency transfer orders to the Forensic Unit when the absence of appropriate mental health treatment results in behavioral problems, psychiatric decompensation and the emergency need for psychiatric services. The survey noted further that, as of June 2000, Rhode Island was one of only three states that did not provide 24-hour mental health care. Id. In the report, it was the only state that failed to report (for some unknown reason) the number and percentage of its inmates receiving therapy or counseling and psychotropic medications. Id.
Absent denial of MHRH's petition, Mr. Nem clearly would be caught in a revolving door. If this Court were to accept the argument of MHRH, then no inmate in need of specialized mental health services beyond those which the ACI can afford the inmate could receive them unless that need were to rise to the level of emergency inpatient hospitalization. The Court then would be sanctioning a process where inmates would be denied the specialized mental health services that they require and allowed to deteriorate until their need rose to the level of emergency hospitalization. A vicious cycle of inadequate treatment at the ACI, decompensation, transfer to the Forensic Unit for stabilization, stabilization, transfer back to the ACI, continued inadequate treatment at the ACI, and further decompensation before transfer back to the Forensic Unit once again could be established — to the profound detriment of the inmate's mental health. That spiral ultimately might lead to an inmate being discharged back into the community with more serious mental health problems and with a greater propensity for danger to self and others than when originally incarcerated. This result cannot be countenanced.
 CONCLUSION
Accordingly, the petition of MHRH to transfer Mr. Nem back to the ACI is denied, as it has failed to prove, by a preponderance of the evidence, that he has sufficiently recovered his mental health. Indeed, this Court is of the view that clear and convincing evidence remains that Mr. Nem is in need of the specialized mental health care that is provided to psychiatric inpatients at the Forensic Unit that cannot be provided at the ACI. This Court will exercise its discretion, therefore, to deny the petition for all of the reasons stated in this decision. Defendant Nem shall remain at the Forensic Unit for the duration of any sentence imposed by this Court pursuant to his plea of nolo contendere, absent a material change in his mental illness, his need for specialized mental health treatment or the psychiatric treatment afforded inmates at the ACI.
Counsel are directed to confer and to submit to this Court forthwith for entry an agreed upon form of order and judgment that is reflective of this decision.
[1] Administrative Order No. 86-1 provides in relevant part, the following: "(1) A section 6 petition shall be assigned for hearing to the daily criminal calendar. Any justice of the superior court may order the examination provided for in said section and set the petition for hearing to a date certain on the daily criminal calendar; (2) In the event that the mental illness of an inmate creates a need for emergency treatment, such petition shall include a request for immediate transfer to the facility provided for in section 40.1-5.3-1 for emergency treatment and examination. An order granting such a petition shall set the petition for hearing to a date certain on the daily criminal calendar to determine whether the inmate should continue to be confined at the Forensic Unit or should be returned to the facility from which he or she was transferred; and (3) A petition for immediate transfer for emergency treatment and examination shall be accompanied, whenever possible, by the affidavit of a psychiatrist setting forth the need for such immediate transfer.